# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

PAULA WHITE,

                        Plaintiff,

-vs-                                                    Case No.  6:03-cv-1207-Orl-KRS

COMMISSIONER OF SOCIAL
SECURITY,

                        Defendant.
_____

## ORDER

This matter came before the Court for consideration without oral argument on the

complaint filed by Paula White seeking review of the final decision of the Commissioner of the

Social Security Administration ("Commissioner") denying her claim for social security disability

benefits.  Doc. No. 1.  The Commissioner answered the complaint and filed a certified copy of the

transcript of the proceedings before the Social Security Administration ("SSA").  Doc. No. 16.

## I.   PROCEDURAL HISTORY.

On April 12, 2000, White filed applications for disability benefits under the Supplemental

Security for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.* and the

Federal Old Age, Survivors and Disability Insurance Program ("OASDI"), 42 U.S.C. § 1382, *et*

*seq.*  TR. 122.[1]  The SSA denied White's applications both initially and on reconsideration.  TR.

81, 85, 103, 106.  Then, White made a timely request for a hearing.  TR. 111.  An Administrative

_____

[1]  This citation only refers to White's application for OASDI benefits.  Records of her initial application for SSI
benefits are not in the record before the Court.  *See* TR. 4.

Law Judge ("ALJ") held a hearing on November 5, 2001, TR. 60-77, and issued a decision finding

White not disabled on November 20, 2001, TR. 88-98.  White requested review of this decision by

the Appeals Council.  The Appeals Council remanded the claim for further consideration.  TR.

112.  On remand, the Appeals Council instructed the ALJ to obtain additional evidence regarding

White's physical and mental impairments, further evaluate White's subjective complaints and

mental impairments, further consider White's maximum residual functional capacity ("RFC")[2]

during the entire period at issue, obtain evidence from a medical expert, and obtain evidence from

a vocational expert.  TR. 114-15.

     After due notice, the same ALJ held a supplemental hearing on March 17, 2003.  TR. 41-

59.  White, who was accompanied by a non-attorney representative, testified at the hearing.  TR.

41.  No vocational expert was called despite the Appeals Council's direction that the ALJ obtain

evidence from a vocational expert.

     After considering the testimony and other evidence in the record, the ALJ found that White

had not engaged in substantial gainful activity since March 19, 2000, the alleged onset date of her

disability.  TR. 23, 31.  The ALJ found that White had a combination of impairments that were

severe, as follows: coronary artery disease post-surgical status after angioplasty and stent

---

[2] Residual functional capacity ("RFC") "is what an individual can still do despite his or her limitations."  Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 61 Fed. Reg. 34474-01 (1996).  It takes into account "the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  *Id.*  RFC assesses the individual's ability "to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . . A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.  RFC does not represent the least an individual can do despite his or her limitations or restrictions, but the most."  *Id.*

placement[3]; concentric hypertrophy of the left ventricle[4] due to hypertension; obesity; non-insulin-dependent diabetes mellitus; and renal hydronephrosis.[5]  TR. 27.  The ALJ concluded that these impairments did not meet or equal an impairment listed in the social security regulations.  *Id.*  The ALJ found that White did not have severe mental impairments based on the evidence that she did not complete psychotherapy sessions, opinions of two doctors that she was exaggerating symptoms, her activities of daily living, and her ability to concentrate sufficiently to prepare a several page document for review of Dr. Witham.  TR. 27-28.  In reaching the conclusion regarding White's mental impairments, the ALJ found that the opinions of Dr. Prickett, Dr. Rosenberg, and the reviewing psychologists were not persuasive.  TR. 28.

The ALJ concluded that White had the RFC to do the following:

> [L]ift up to 20 pounds occasionally and 10 pounds frequently and walk or stand for at least six hours and sit for eight hours in an eight-hour workday and stoop occasionally, climb a ladder, rope or scaffold and balance occasionally and perform unlimited push and/or pull of arm or leg controls and use her arms and hands for grasping, holding and turning objects. [White] . . . should avoid concentrated exposure to extreme cold, extreme heat and such dangerous hazards as unprotected heights.

TR. 30.  He concluded that White had no other exertional or nonexertional limitations.  *Id.*  In reaching this conclusion, the ALJ credited the opinions of Dr. Kitay, a reviewing physician and Dr.

---

[3]  Angioplasty refers to the recanalization of a blood vessel, often accomplished with balloon dilation or placement of a stent. STEDMAN'S MEDICAL DICTIONARY 87 (26th ed. 1995) (hereinafter "Stedman's").  Stent placement refers to a procedure in which a thread, rod, or catheter is placed in a tubular structure, *e.g.*, a blood vessel, to provide support during, among other sorts of procedures, angioplasty.  Stedman's at 1674.

[4]  This refers to a general increase in the bulk of a chamber of the heart.  Stedman's at 832.

[5]  Renal hydronephrosis refers to dilation of the pelvis and calices of one or both kidneys resulting from obstruction of the flow of urine.  Stedman's at 817.

Perdomo, a consulting physician.  He also found that White's testimony about her subjective

symptoms and limitations was inconsistent with her activities of daily living and did not support a

conclusion that she is disabled.  TR. 29-30.

    The ALJ concluded that these impairments did not preclude White from performing her

past relevant work as a receptionist.  TR. 32.   He relied upon the Dictionary of Occupational Title

("DOT") description of the duties of a receptionist, which are described as follows:

> [R]equiring lifting and carrying 10 pounds maximum and reaching,
> handling, talking and hearing frequently, with fingering occasionally
> present.  The Temperaments of this position include performing
> repetitive or short-cycle work and dealing with people.

TR. 30.  The ALJ noted that there were no environmental concerns with such a job.  *Id.*  The ALJ

reasoned that because White's socialization skills were not severely compromised, and she had the

RFC to perform light work, that she could return to her former work as a receptionist.  TR.  31.

Accordingly, the ALJ found that White was not disabled.  TR. 31.

    White requested review of the ALJ's decision on April 25, 2003.  TR. 12.  Subsequently,

on June 18, 2003, the Appeals Council found no basis for changing the ALJ's decision.  TR. 9-10.

White timely sought review of this decision by the United States District Court.  Doc. No. 1.

    The Commissioner issued a final decision after a hearing with respect to White's

application for disability benefits under OASDI and SSI.  Therefore, this Court has jurisdiction of

this matter under 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## II.     STATEMENT OF FACTS.

A.     *White's Testimony.*[6]

White was born on May 27, 1953.  TR. 44, 63.  She used to weigh 178 pounds, but now weighs approximately 160 pounds.  TR. 73.  She attended school through the tenth grade and attained an General Educational Development high school equivalency diploma in 1988.  TR. 45, 63.  She also attended beauty school.  TR. 46.

In her most recent employment, she worked as a receptionist at a variety of businesses.  TR. 47-48, 56, 64-66.  As a receptionist, she answered numerous telephone lines.  TR. 48.  In addition, she worked as a waitress at a Waffle House restaurant off and on for approximately twelve to fifteen years.  TR. 47-48, 66, 74.  She considered returning to her job at the Waffle House, but concluded that there was "no way [she] could be on [her] feet that long."  TR. 74.  She also completed work as a "shop secretary" for a paving company and as a driver for two other businesses.  TR. 133.

White experienced a great deal of difficulty in managing multiple telephone lines in her receptionist jobs.  TR. 47-48.  White opined that the overriding reason for her inability to work is her "problem talking to people," due to nervousness.  TR. 55, 57.  She becomes paranoid in interviews.  TR. 55.  She also has trouble following directions.  TR. 55.  For example, if given an order, she would forget what she had been told to do and how to do it two months later.  TR. 55.  She also had difficulty concentrating.  TR. 55.

---

[6]  The following recitation of White's testimony is drawn from both of her hearings before the ALJ.

White sees a psychiatrist named Dr. Nagareddy.  TR. 50.  This physician diagnosed White

with depression and prescribed Xanax and Zoloft for her.  TR. 50.  She had previously been

diagnosed as suffering from depression and post-traumatic stress disorder.  TR. 55.  She

experiences anxiety, and has anxiety attacks at least three times per week.  TR. 56.  She lost a job

as a receptionist because of her inability to follow instructions and pay attention.  TR. 56.  White's

depression makes her feel like she does not need to be around people and makes her not "do well

around people."  TR. 50.  White "can't remember things from one minute to the next."  TR. 50;

*accord* 66-67, 70.

White suffered a heart attack on March 19, 2000.  TR. 49.  As a result of her heart attack,

she underwent an angioplasty and a stent replacement.  TR. 67.  She continues to have little sharp

pains in her heart occasionally.  TR. 67.  She takes a number of medications for high blood

pressure.  TR. 49, 68.  White did not take nitroglycerine tablets, which her doctor had prescribed,

because they gave her a "really, really bad head rush . . . ."  TR. 74.  She experiences pain in her

chest, which her cardiologist thinks may be caused by a gall bladder problem.  TR. 49.

White takes Glucotrol pills and Glucophage Excel[7] to treat her diabetes.  TR. 54.  She

regularly checks her blood sugar, which usually is "not bad."  TR. 54.  White gets kidney

infections approximately once every six months, which cause back pain.  TR. 68- 69.

On a typical day, White arises at 4:30 or 5:30 a.m., makes breakfast, and takes all of her

medicine.  TR. 50, 71.  She "sit[s] around and watch[es] TV," and tries to "piddle around the

---

[7]  Glucophage is a drug that reduces the amount of sugar the body absorbs from food and produced by the liver. Cerner-Multum, Inc., *Glucophage*, DRUGS.COM (Apr. 18, 2005) *at* http://www.drugs.com/glucophage.html (last visited July 26, 2005) (hereinafter "Drugs.com").

house a little bit and do stuff . . . ."  TR. 51, 71.  She is unable to straighten up her house as quickly

as she was able to previously.  TR. 51.  When it comes to cleaning, White must "do a little bit and

sit down and do a little bit and sit down . . . ."  TR. 71.  White tries to clean, but becomes tired and

must rest.  TR. 51.  Once she rests for ten minutes, she falls asleep.  TR. 51.  If she is left alone,

White sleeps for eighteen hours per day.  TR. 53.

As an example of White's ability to lift objects, she explained that she picked up her

nephew's girlfriend's little boy, who weighed approximately thirty to fifty pounds, and could not

hold him for twenty minutes.  TR. 52.  However, she can lift is a gallon of milk.  TR. 71.  White is

able to wash her clothes in a washing machine.  TR. 72.

White's only hobby is repotting plants in her carport.  TR. 53.  She used to enjoy bowling,

but cannot perform that activity anymore because she could not lift and carry things.  TR. 51-52.

She could stand for about fifteen minutes, but she sometimes became dizzy while standing.

TR. 52, 70-71.  She can walk approximately ninety feet, but she had to rest every fifteen or twenty

minutes.  TR. 52, 70.  She could sit for about thirty minutes.  TR. 70.  If she sits, she falls asleep.

She can only drive a car approximately eight miles.  TR. 52.  When she gets tired, she experiences

pain in her chest, right above her collar.  TR. 67.

She takes the medication her doctors prescribe "[r]eligiously."  TR. 53, 68.  Her

medications cause the side effect of making her mouth "really dry."  TR. 53.

B.      *Medical Records.*

On October 31, 1994, White went to the emergency room at Southern Regional Medical

Center in Riverdale, Georgia ("Southern Regional") complaining of a sore throat and difficulty

swallowing.  TR. 216.  Candice E. Wallace, M.D., examined White, and noted that White's

medical history was significant for hypertension.  TR. 216.  Dr. Wallace diagnosed White with

pharyngitis,[8] tonsillitis, and urinary tract infection, and prescribed Bactrim and Lortab for White.[9]

TR. 216.

On June 27, 1996, White went to the emergency room at Southern Regional complaining

of weakness and dizziness.  TR. 198, 200.  Timothy L. Turnbull, M.D., examined White, and

noted that she was taking the medications Propranolol and hydrochlorothiazide.[10]  TR. 198.  The

Southern Regional staff administered Procardia to temporarily lower White's blood pressure.[11]

TR. 198.  Dr. Turnbull diagnosed White with essential hypertension and symptomatic weakness of

unknown etiology. TR. 198.

From July 1997 to January 2000, White visited J.S. Reynolds, M.D., on a number of

occasions.  TR. 248-53.  Dr. Reynold's consistently prescribed Glucotrol, Maxzide, Premarin, and

similar medications to treat White's conditions.[12]

On May 1, 1998, White visited the South Fulton Medical Center in East Point, Georgia,

complaining of a "sharp, burning pain radiating to her neck."  TR. 159.  Thomas J. Locke, M.D.,

---

[8] Pharyngitis refers to inflammation of the pharynx, or the upper portion of the digestive tube just above the esophagus. Stedman's at 1341.

[9] Bactrim is an antibiotic drug used to treat infections. Drugs.com *at* http://www.drugs.com/bactrim.html (last visited July 26, 2005).  Lortab is a hydrocodone-based (*i.e.*, opiate) painkilling drug.  Drugs.com *at* http://www.drugs.com/lortab.html (last visited July 26, 2005).

[10] Propranolol is an antihypertension medication.  Phillip W. Long, *Propranolol*, INTERNET MENTAL HEALTH (2005), *at* http://www.mentalhealth.com/drug/p30-i02.html (last visited July 26, 2005).

[11] Procardia is a drug that retards the movement of calcium in the heart and is used to treat high blood pressure. Drugs.com *at* http://www.drugs.com/Procardia_XL (last visited July 26, 2005).

[12] Maxzide is a diuretic used to decrease the amount of water in the body.  Drugs.com *at* http://www.drugs.com/cons/Maxzide.html (last visited July 26, 2005).  Premarin is a drug that increases the female sex hormone, estrogen, in the person taking it. Drugs.com *at* http://www.drugs.com/premarin.html (last visited July 26, 2005).

administered an electrocardiogram ("ECG"), which revealed a left axis deviation[13] and a left

ventricular hypertrophy with a strain pattern.[14]  TR. 159.  Dr. Locke's impressions were that

White's chest pain appeared to have multiple causes and that she had uncontrolled diabetes

mellitus.  TR. 159.

White again sought treatment at Southern Regional in February 1999, complaining of chest

palpitations.  The diagnosis was acute hypertensive urgency.  TR. 191-92.

A medical record dated February 23, 2000, indicates that a sonogram of White's kidneys

demonstrated left renal hydronephrosis.  TR. 217.

On August 27, 1999, White returned to the emergency room at the Southern Regional

complaining of left flank pain.[15]  TR. 176.  Peter D. Steckl, M.D., examined her.  TR. 176.  Dr.

Steckl noted that White was taking the medications Lotrel, Premarin, Maxzide, Glucotrol, and

Glucophage.  TR. 176.  Dr. Steckl concluded that her pain was secondary to acute pyelonephritis.[16]

TR. 177.  He prescribed Pyridium, Bactrim, and Darvocet for White.[17]  TR. 177.

---

[13]  A left axis deviation refers to a condition in which the electric impulses that govern the flow of blood through the left side of the body display an abnormality and often indicates a myocardial infarction.  *ECG Scribbles* (July 4, 2003), *at* http://www.anaesthetist.com/icu/organs/heart/ecg (last visited July 26, 2005).

[14]  A ventricular hypertrophy with a strain pattern refers to a swelling of a heart ventricle, which is a sign of an overuse or over-exertion.  Stedman's at 832, 1682.

[15]  The flank, known as the *latus*, is the side of the body between the pelvis and the ribs.  Stedman's at 939.

[16]  Pyelonephritis refers to inflammation of the kidney.  Stedman's at 1471.

[17]  Pyridium is an analgesic pain reliever.  Drugs.com *at* http://www.drugs.com/cons/Pyridium.html (last visited July 26, 2005).  Darvocet is a narcotic analgesic pain reliever.  Drugs.com *at* http://www.drugs.com/darvocet.html (last visited July 26, 2005).

On February 4, 1999, White again visited the emergency room at Southern Regional complaining of chest palpitations. TR. 191. Patrice Ringo, M.D., examined White, diagnosed her with an acute hypertensive urgency, and discharged her with orders to return. TR. 192.

From October 25, 1999, to February 11, 2000, White received treatment at Ellenwood Health Care from Charles Clopton, Jr., M.D. TR. 220-27. Treatment notes dated November 23, 1999, reflect that White had uncontrolled hypertension. TR. 225. In February 2000, White complained of numbness in her thoracic spine and radiating abdominal pain. TR. 220. An ultrasound revealed moderate left renal hydronephrosis. TR. 217.

Between March 20, 2000, and March 25, 2000, White was admitted to Florida Hospital. TR. 229. She had visited the hospital complaining of prolonged chest pain that had lasted for several days. TR. 229. Records reflect that White was 5'4" tall and weighed 156 pounds. TR. 243. Her hypertension was controlled, TR. 244, but an echocardiogram revealed concentric hypertrophy of the left ventricle from longstanding hypertension. TR. 240.

An ECG revealed a sinus rhythm with a possible left anterior fascicular block and atrial enlargement and poor R-wave progression.[18] TR. 230, 240-41. Other tests revealed a slight tortuosity of the descending thoracic aorta.[19] TR. 246. These results suggested that White had experienced a myocardial infarction, *i.e.*, a heart attack. TR. 229. On March 23, 2000, Robert

---

[18] A fascicular block refers to an agent or tissue of some sort arranged in a bundle or series of rods that is blocking the flow of blood to the heart. Stedman's at 630. The term R-wave progression refers to the functioning of one component of the electrical system in the human body that regulates blood flow. *ECG Scribbles* (July 4, 2003), *at* http://www.anaesthetist.com/icu/organs/heart/ecg (last visited July 26, 2005).

[19] Tortuosity refers to the presence of many "turns and twists" in a structure. Stedman's at 1825. The thoracic aorta is the portion of the aorta, or the main blood vessel that attaches to the heart, that is located in the chest. Stedman's at 1806.

-10-

Boswell, M.D., performed a cardiac catheterization[20] and an angioplasty and implanted a stent.

TR. 236-39.  Harold L. Greenberg, M.D., made the following diagnoses upon White's discharge

from the hospital: (1) acute non-Q-wave myocardial infarction[21]; (2) two-vessel coronary artery

disease; (3) diabetes mellitus under fair control; and (4) essential hypertension under good control.

TR. 231.  Dr. Greenberg prescribed the following: (1) Ecotrin; (2) Nitroglycerin; (3) Norvasc; (4)

Premarin; (5) Glucophage; (6) Maxzide; (7) K-Dur; and (8) Plavix.[22]  TR. 231.

Following surgery, Dr. Greenberg continued to treat White.  In March 2000, he diagnosed

her with depression, and added Zoloft to her prescription medication. TR. 296.  In April 2000, Dr.

Greenberg observed that White's depression seemed improved.  TR. 293.  However, she had a

continued problem with high blood pressure. TR. 289, 292.  Later in the month, however, Dr.

Greenberg observed that White's high blood pressure was under control with medication.  TR.

287.  However, he noted that White's diabetes were not under good control.  TR. 287.  Dr.

Greenberg also switched White's medication from Zoloft to Wellbutrin.  TR. 287.  In July 2000,

Dr. Greenberg noted that White was able to walk around the mall and do housework, although she

tired easily and had occasional palpitations.  TR. 276.

---

[20] A cardiac catheterization involves the placement of a tubular instrument into the hear via a blood vessel. Stedman's at 292-93.

[21] The term non-Q-wave myocardial infarction is a causation-excluding way of saying that a heart attack was caused by a particular malfunctioning in the electrical system which regulates the human body's blood circulation. *ECG Scribbles* (July 4, 2003), *at* http://www.anaesthetist.com/icu/organs/heart/ecg (last visited July 26, 2005).

[22] Ecotrin is a drug similar to Aspirin used to treat pain and fevers.  Drugs.com *at* http://www.drugs.com/cons/Ecotrin_Tablets.html (last visited July 26, 2005).  Nitroglycerine is a nitrate, or a drug that widens blood vessels. Drugs.com *at* http://www.drugs.com/MTM/nitroglycerin.html (last visited July 26, 2005).  Norvasc is a drug used to treat hypertension by widening blood vessels. Drugs.com *at* http://www.drugs.com/norvasc.html (last visited July 26, 2005).  Plavix is a medication that prevents blood clots from forming.  Drugs.com *at* http://www.drugs.com/plavix.html (last visited July 26, 2005).

On June 27, 2000, Alex Perdomo, M.D., examined White at the request of the SSA.  TR. 272-73.  At that time, White weighted 165 ½ pounds.  TR. 272.  Dr. Perdomo noted that White complained of frequent episodes of chest pain.  TR. 272.  Dr. Perdomo's impressions were that White had a history of coronary artery disease, with a need to rule out unstable angina, hypertension, and diabetes.  TR. 273.  Dr. Perdomo recommended a cardiology follow-up to rule out occlusive disease,[23] but concluded that White "could perform well in a sedentary low stress job at the present time."  TR. 273.

On July 25, 2000, Dr. Greenberg examined White and completed an evaluation of her condition.  TR. 276.  Dr. Greenberg concluded that White had the following conditions: (1) hypertension; (2) concentric hypertrophy of the left ventricle; (3) post-heart attack status; (4) post-angioplasty and stent status; (5) diabetes mellitus; and (6) depression.  TR. 276.  Dr. Greenberg's prescription was for White to continue her medications, lose weight, and undergo a psychiatric evaluation.  TR. 276.

Medical records in White's file indicate that, on March 23, 2001, she visited the urgent care clinic of the Grady Health System in Atlanta, Georgia ("Grady Health").  TR. 343.  The physician who treated White assessed her with a urinary tract infection and hypertension.  TR. 343.  On May 22, 2001, White returned to Grady Health for a follow-up appointment.  A physician diagnosed her with depression, diabetes mellitus, and hypertension, among other things.  TR. 338.  The physician prescribed Zoloft for White.  TR. 338.  Physicians at Grady Health consistently made similar diagnoses of White at subsequent visits.  TR. 333-37.

---

[23]  The term occlusive disease as used in this context appears to refer to a condition in which a blood vessel is closed.  Stedman's at 1237.

On August 7, 2002, Homayoun S. Amin, M.D., of Atlanta Heart Associates, examined White based on complains of chest pain radiating to her arm  TR. 387.  Dr. Amin's impressions of White were as follows: (1) atypical chest pain; (2) artherosclerotic heart disease; (3) previous angioplasty and myocardial infarction; (4) depression; (5) hypertension; (6) diabetes mellitus; and (7) hypercholesterolemia.  TR. 388.  Dr. Amin advised White to avoid strenuous activities and take nitroglycerine as needed.  TR. 388.  Dr. Amin further prescribed Lopressor, Aspirin, and Accupril.[24]  TR. 388.

On August 21, 2002, White had an echocardiogram.  TR. 383.  Based on the results of this procedure, Gopal C. Rao, M.D., concluded that White had mild concentric left ventricular hypertrophy with normal cavity dimensions, a dilated left atrium, and mild mitral regurgitation and tricuspid regurgitation.[25]  TR. 383.  On August 21, 2002, Dr. Amin administered a Bruce protocol stress test.  TR. 379.  The stress test revealed no perfusion defect during stress or resting.[26]  TR. 379.  Dr. Amin interpreted these results as being negative for ischemia and infarction.[27]  TR. 379. On August 29, 2002, upon Dr. Amin's referral, Michael R. Plemons, M.D., ordered and interpreted X-Rays of White's chest.  TR. 386.  Dr. Plemons concluded that White's heart and

---

[24]  Lopressor is a "beta blocker" or a drug that affects the heart and circulatory system and is used to treat hypertension. Drugs.com *at* http://www.drugs.com/mtm/l/lopressor.html (last visited July 26, 2005).  Accupril is in a class of drugs called angiotensin-converting-enzyme inhibitors and is used to treat hypertension.   Drugs.com *at* http://www.drugs.com/accupril.html (last visited July 26, 2005).

[25]  A mitral regurgitation refers to a backward flow of blood through an incompetent mitral valve in the heart. Stedman's at 1524.  A tricuspid regurgitation refers to a similar backward flow in the tricuspid valve.  *Id.*

[26]  Perfusion is the flow of blood.  Stedman's at 1325.

[27]  Ischemia is a "local anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply." Stedman's at 894.  Infarction is a "[s]udden insufficiency of arterial or venous blood supply . . ." such as occurs during a heart attack.  Stedman's at 868.

lungs revealed no acute or significant abnormality, though he noticed mild degenerative changes in her dorsal spine. TR. 386. White's medical records indicate that she saw Dr. Amin three more times in August 2002 and January and February 2003. TR. 373-78. At each of these visits, Dr. Amin's impressions remained the same as those he formulated after his August 7, 2002, examination of White. TR. 373-78.

In addition to the physical treatment discussed above, White's medical records also indicate that she received medical attention for her mental impairments. On May 30, 2000, Leigh S. Rosenberg, Psy.D., examined White at the request of the SSA. TR. 254, 281. White's main complaint was inability to concentrate, although she also reported depression and anxiety. TR. 254, 256. Dr. Rosenberg administered a number of psychological tests, including the following: (1) Symptom Picture and Life Situation questionnaire; (2) face-to-face interviewing; (3) Kaufman Short Neuropsychological Assessment Procedure ("K-SNAP"); (4) Rey 15 Item Memorization Task; and (5) Stroop Neuropsychological Screening Test ("SNST").[28] TR. 254. While Dr. Rosenberg noted that White had "a histrionic like quality to her dramatic presentation," test results showed that "no deliberate attempt at malingering." TR. 257. Other test results indicated that White had organic or psychiatric factors that were interfering with her cognitive functioning. TR. 257.

---

[28] The K-SNAP is "a brief, individually administered measure of the cognitive functioning of adolescents and adults." AGS Publishing, *K-SNAP: Kaufman Short Neuropsychological Assessment Procedure* (2005), *at* http://www.agsnet.com/Group.asp?nGroupInfoID=a3560 (last visited July 26, 2005). The Rey 15 Item Memorization Task is a "malingering" test designed to detect a subject's lying about stress levels. K.B. Boone, I. Savodnik, S. Ghaffarian, A. Lee, D. Freeman, N.G. Berman, *Rey 15-Item Memorization and Dot Counting Scores in a "Stress" Worker's Compensation Population: Relationship to Personality (MCMI) Scores*, 51:3 J. CLIN. PSYCH. 457-63 (1995), abstract *available at* http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids= 7560151&dopt=Abstract (last visited July 26, 2005).

Dr. White's impressions were dysthymia,[29] adjustment disorder with anxious features, stress-related physiological response, and a cognitive disorder, with borderline and histrionic personality features.   TR. 257-58.  Dr. Rosenberg assigned White a global assessment of functioning ("GAF") score of 57.[30]  Dr. Rosenberg concluded that White's "ability to work at a full time position at the present time appears significantly compromised."  TR. 258.   However, she could perform "simple highly structured tasks in a adequate fashion," but her ability to concentrate, remember instructions, and the like were significantly compromised.  TR.  258.   In a May 31, 2000, letter to Dr. Greenberg, Dr. Rosenberg opined that White's "emotional distress [was] being dramatized, but also that it [was] a potent contributor to her somatic and cognitive problems."  TR. 281.

On July 27, 2000, E. Michael Gutman, M.D., examined White.  TR. 298.  Dr. Gutman noted that White complained of being depressed, anxious, and "scared easily."  TR. 298.  Dr. Gutman diagnosed her with unipolar depression, and recommended that she seek further treatment. TR. 298.  In August 2000, White sought psychological treatment from Lakeside Alternatives, but there is no indication in the records what type of treatment, if any, she received.  TR. 347-52.[31]

---

[29]   Dysthymia refers to a chronic disorder of a depressed mood.  HAROLD I. KAPLAN & BENJAMIN J. SADOCK, SYNOPSIS OF PSYCHIATRY 574 (8th ed. 1998) (hereinafter "Kaplan & Sadock")  An adjustment disorder is a condition that develops as a result of a psychological stressor. *Id.* at 772.

[30]   A GAF of 57 reflects "[m]oderate symptoms ([*e.g.*], flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning ([*e.g.*], few friends, conflicts with peers or coworkers)." *Id.* at 299.

[31]   The intake records reflect a diagnosis of major depressive disorder, reurrent with a GAF of 45, but the record does not reflect whether this assessment was made by a qualified health care professional.  TR. 351.   A psychiatrist certified the treatment plan, but the qualifications of the assessment specialist, who presumably made the diagnosis and GAF finding, are not identified.

From February to May 2002, White received psychological treatment at Cross Keys

Counseling Center from Denise McKinney, M.A., who was supervised by Doris W. Hummit,

Ph.D.  TR. 357-64.  McKinney consistently diagnosed White with major depression and a Global

Assessment of Functioning ("GAF") of 50.[32]  TR. 357-64.

On September 25, 2002, Kevin J. Witham, Ph.D., completed a psychological examination

of White at the request of the SSA.  TR. 353.  White drove herself to the examination.  TR. 353.

She provided Dr. Witham with document she wrote, which was several pages long, describing her

history of trauma and abuse in great detail.  TR. 353.  Dr. Witham noted White's history of

emotional and psychological disorders, and stated that "[t]he wide number of very severe

symptoms are of questionable validity considering her response style to the personality portion of

the evaluation."  TR. 354.  Dr. Witham also noted that the results of a Minnesota Multiphasic

Personality Inventory-2 ("MMPI-II")[33] were invalid, because the validity indicators built into the

test indicated that White was "faking bad."  TR. 354.  Dr. Witham noted that White's responses

seemed exaggerated, and he stated that "[t]his is a clear indication of an intentional attempt to

present oneself in a highly pathological manner."  TR. 354.  Nevertheless, Dr. Witham diagnosed

White with depressive disorder and anxiety disorder.  TR. 354.  He prepared a mental RFC

---

[32] A GAF of 50 indicates that a subject has "[s]erious symptoms ([*e.g.*], suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning ([*e.g.*], no friends, unable to keep a job)."  Kaplan & Sadock at 287.

[33] This test is "a standardized questionnaire developed at the University of Minnesota in 1940, is one of the most popular clinical psychology personality inventories in use today. . . . The scoring generates six validity scales and 10 basic clinical or personality scales. The latter are, in order, as follows: Hypochondriasis, Depression, Hysteria, Psychopathic Deviate, Masculinity-Femininity, Paranoia, Psychasthenia, Schizophrenia, Hypomania, and Social Introversion."  Jeffrey Kaye, *Introduction to the Minnesota Multiphasic Personality Inventory (MMPI-2)* (Feb. 23, 2005), *at* http://www.drjeffkaye.com/mmpi.htm (last visited July 26, 2005).

assessment in which he found no functional limitations arising from White's mental impairments. TR. 355-56.

On March 3, 2003, Narendra K. Nagareddy, M.D., a psychiatrist, examined White.  TR. 365-72.  Dr. Nagareddy concluded that White had post-traumatic stress disorder (PTSD) and major depression with a GAF of 60.[34]  TR. 365.

        C.     *Reviewing Physicians' Opinions.*

           1.   <u>Mental Impairments</u>.

On June 22, 2000, a professional whose name is illegible prepared Psychiatric Review Technique Form ("PRTF") based on a review of White's medical records.  TR. 259-71.  This professional concluded that White had dysthymia, an adjustment disorder, and some somatoform disorder.  These mental impairments would, in the reviewing professional's opinion, cause moderate limitations in the ability to do the following:  (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  TR. 268-69.

On October 27, 2000, Jeffrey L. Prickett, Psy.D., completed a PRTF and mental RFC assessment with respect to White.  TR. 315-32.  Dr. Prickett opined that White had psychological abnormalities of memory impairment, perceptual or thinking disturbances, and mood disturbance. TR. 316.  He also opined that White had dysthymia and an adjustment disorder.  TR. 318, 320.

---

[34]  A score between 51 and 60 is defined as moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition* 32 (4th ed. 1994).

Dr. Prickett concluded that White's psychological state would impose moderate limitations on her daily activities and her ability to maintain concentration, persistence, or pace. TR. 325. He further found that White would have mild limitations in social functioning and one or two repeated episodes of decompensation. TR. 325.

In his mental RFC assessment, Dr. Prickett opined that White would be moderately limited with respect to the following abilities: (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3) maintaining attention and concentration for extended periods; (4) working in coordination with or proximity to others without being distracted; (5) completing a normal workday or workweek without interruptions from psychologically-based symptoms; (5) responding appropriately to changes in the work setting. TR. 329-30. Dr. Prickett concluded that White would be able to carry out simple instructions, make simple decisions, and complete routine tasks within her physical limits. TR. 331.

On October 1, 2002, a psychologist whose name is not legible completed a questionnaire regarding White's mental ability to do work-related activities, based on a review of White's medical records and an interview with White. TR. 355. The psychologist concluded that White had no mental impairments that would preclude her from working. TR. 356.

> 2.    <u>Physical Impairments</u>.

On July 31, 2000, Michael Presley completed a physical RFC assessment of White based on a review of her medical records. TR. 299. Dr. Presley opined that White would be subject to the following exertional limitations: (1) occasionally lift or carry no more than fifty pounds; (2) frequently lift or carry no more than twenty-five pounds; (3) stand or sit for a total of six hours in an eight-hour work day. TR. 300. He did not note any nonexertional limitations.

-18-

On October 14, 2000, David Z. Kitay, M.D., completed a physical RFC assessment of White based on a review of her medical records.  TR. 314.  Dr. Zitay opined that White would subject to the following exertional limitations: (1) occasionally lift or carry no more than twenty pounds; (2) frequently lift or carry no more than ten pounds; (3) stand, walk, or sit for up to six hours in an eight-hour workday.  TR. 308.  Dr. Zitay further opined that White would be occasionally limited in her ability to climb a rope and balance.  TR. 309.  In addition, he recommended that White should avoid concentrated exposure to extreme cold, extreme heat, and hazards.  TR. 311.

## III.    STANDARD OF REVIEW.

To be entitled to Social Security disability benefits under SSI or OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C).  The Act provides further that a claimant is not disabled if he or she is capable of performing his previous work.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the

existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision.  *Id.*  While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

## IV.    ANALYSIS.

In her memorandum of law, White asserts the following bases for reversing the decision of the Commissioner: the ALJ erroneously found that her mental impairments were not severe; the ALJ erroneously found that she could return to her past relevant work; the ALJ failed to consider the effects of her impairments in combination; the ALJ failed to make the appropriate function-by-function assessment of White's RFC; the ALJ failed to consider her obesity in his analysis; and the ALJ failed to give appropriate weight to White's subjective testimony.  Doc. No. 26 at 10-17. These are the only issues I will address.

A.    *Whether White's Mental Impairments Are Severe.*

After developing further evidence following the Appeals Council's remand, the ALJ concluded that White did not have a severe mental impairment. The question presented is whether this determination regarding the severity of White's mental condition was based upon a proper application of the law and is supported by substantial evidence.

"In determining the severity of an impairment at the second stage of the required sequential evaluation, the claimant need only show that an abnormality's effect is not so minimal that it would not interfere with his ability to work irrespective of his age, education or work experience. *McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir.1986)." *Cantrell v. Bowen*, 804 F.2d 1571, 1573 (11th Cir. 1986). The social security regulations require a specific technique to be followed in evaluating whether a mental impairment is severe. *See Moore v. Barnhart*, 405 F.3d 1208, 1213-14 (11th Cir. 2005). "This technique requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts four functional areas: 'activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.' 20 C.F.R. § 404.1420a-(c)(3-4). The ALJ is required to incorporate the results of this technique into the findings and conclusions. 20 C.F.R. § 404.1520a-(e)(2)." *Id.*

In this case, the ALJ followed the required technique. He determined that White had only mild limitations in the first three mental functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and no limitation in the fourth area (decompensation). TR. 28. If these conclusions are supported by substantial evidence, and there is no other evidence of that indicates that there is more than a minimal limitation in White's ability to do basic work activities, then the ALJ correctly determined that White's mental impairment was not severe. *See* 20 C.F.R. § 1520a(d)(1).

-21-

The ALJ based his conclusions largely on the opinion of Dr. Witham that the results of the MMPI-II administered in 2002 showed that White was overendorsing her symptoms, or "faking bad." Despite the MMPI-II test results, Dr. Witham opined that White had a depressive disorder and anxiety disorder. However, he concluded that neither condition resulted in any mental functional limitations. White was apparently able to prepare a several page document for Dr. Witham describing her personal history, indicating that her ability to remember and concentrate sufficiently to prepare the document was not compromised. Finally, the ALJ noted, and substantial evidence in the record reflects, that White was able to concentrate sufficiently to watch television and drive a car.

There is certainly other evidence in the record that would support a finding that White's mental impairment was severe. In this case, however, the ALJ applied the correct law and made a reasoned determination of the evidence to be credited. Because there was no evidence from a mental health professional who treated White over time, the ALJ was required to determine, from the record as a whole, which of the various examining and reviewing professionals to credit. Because substantial evidence supports the reasons he cited for crediting Dr. Witham's opinion, the ALJ's conclusion that White did not suffer a severe mental impairment should be upheld.[35]

   B.   *The ALJ's Past Relevant Work Finding.*

White contends that the ALJ's finding that her impairments did not prevent her from returning to her past relevant work was insufficient because the ALJ failed to provide a sufficiently specific comparison of White's residual functional capacity to the demands of her past

---

[35] Furthermore, any error made at this step of the evaluation process is harmless because, as discussed below, the ALJ continued to consider White's mental condition in the later steps of the analysis.

employment.  Doc. No. 26 at 10.  White cites Social Security Ruling 82-62 for the proposition that

an ALJ must make specific findings of fact regarding the mental demands of a claimant's past

relevant work and whether the claimant's residual functional capacity falls within those demands.

*Id.* at 12.

The ALJ relied on the DOT to establish the requirements of White's past relevant work as

a receptionist.  This was proper because, at step four of the sequential evaluation process, the

claimant must show the inability to do the type of work she previously did, not merely the specific

job he or she held.  *Jackson v. Bowen*, 801 F.2d 1291, 1293 (11th Cir. 1986).  The ALJ consulted

the DOT, which stated that the mental requirements of the job were the ability to perform

repetitive or short-cycle work and deal with people.  TR.  30.  He specifically considered White's

mental abilities in determining whether she could return to this job, finding that her socialization

skills had not been significantly compromised.  This, coupled with his finding that White had only

mild limitations in the area of concentration, persistence, and pace, supported his finding that

White could return to her work as a receptionist, as that job is performed generally. Because the

ALJ properly considered the mental demands of White's past relevant work, as performed in the

national economy, there was no error in his evaluation of her ability to return to her past relevant

work

C.      *The ALJ's Consideration of White's Impairments in Combination.*

 White also contends that the ALJ failed to consider the effects of her impairments in

combination in determining that she was not disabled.  Doc. No. 26 at 12.

"'It is the duty of the . . . [ALJ] to make specific and well-articulated findings as to the

effect of the combination of impairments and to decide whether the combined impairments cause

the claimant to be disabled.'"  *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987) (quoting *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984)).  The ALJ must consider each impairment alleged by the claimant and every impairment alleged.  *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986).  However, if the record establishes that the ALJ considered all of the claimant's impairments, the conclusory statement that the ALJ considered the impairments in combination is adequate.  *See Wilson v. Barnhart*, 284 F.3d 1219, 1224-25 (11th Cir. 2002) (quoting *Jones v. Dep't Health & Human Serv.*, 941 F.2d 1529, 1533 (11th Cir. 1991)).

In the present case, I do not find, nor does White point to, any medical conditions with which she had been diagnosed that the ALJ did not mention in his analysis.  *See* Doc. No. 26 at 13.  Moreover, in his analysis, after reciting medical evidence that was relevant to each of White's physical and mental impairments, the ALJ stated, "[i]n making this [RFC] assessment, *the undersigned must consider all symptoms*, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of" the relevant social security regulations.  TR. 29 (emphasis added).  The ALJ went on to note that White "has *a combination of impairments* considered 'severe' based on the requirements in the" relevant social security regulations and listed anxiety and depression along with White's physical impairments.  TR. 31 (emphasis added).  Finally, in one unified concluding paragraph, the ALJ discussed White's physical heart and circulatory-system-related impairments, her diabetes-related impairments, and her mental impairments in reaching the conclusion that White's impairments did not preclude her from returning to her past relevant work.  TR. 32.  These findings by the ALJ are sufficient to demonstrate that he considered White's impairments, including obesity, in combination.  *Wilson*, 284 F.3d at 1224-25.

-24-

D.    *Function-by-Function Assessment.*

 White also asserts that the ALJ's assessment of her RFC was improper because it failed to include a "function by function" assessment required by Social Security Ruling 96-8.  Doc. No. 26 at 14.  She specifically asserts that the RFC assessment was deficient because the ALJ did not discuss whether she was able to engage in sustained work activity on a regular and continuing basis.  Although the ALJ did not explicitly state that White could perform work on a sustained basis, his finding that she could return to her past relevant work necessarily incorporated a "sustained work" finding into his analysis.  *See Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003) ("Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment.").  Therefore, the ALJ did not err by failing to make an explicit, discrete "sustained work" RFC finding.

E.    *Consideration of Obesity.*

White's fourth contention is that the ALJ erred by failing to consider the limitations arising from her obesity.  She relies upon SSR 02-01, which instructs that ALJ should "consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity," and sets out a medical explanation of what obesity is and how it can affect a person's ability to perform certain tasks.  *Titles II & XVI: Evaluation of Obesity*, Soc. Sec. R. 02-01p (Sept. 12, 2002).  SSR 02-01 recognizes that obesity can cause limitations in may exertional and nonexertional areas.

-25-

Here, the ALJ found that White was obese, which is evidence that he considered that factor

in his analysis.  White does not point to any evidence that shows that her obesity limited her ability

to perform consistently with the requirements of the RFC determined by the ALJ.  When, as here,

the claimant cites no evidence in the record that supports the argument that the ALJ failed to

consider the effects of obesity in determining the RFC, there is no error simply because the ALJ

did not cite to SSR 02-01.

F.     *Subjective Testimony.*

White further contends that the ALJ failed to offer a sufficient explanation for discrediting

her subjective testimony regarding her mental ability to perform work as a receptionist.  In

particular, White objects to the ALJ's conclusion that the daily activities to which White testified

and the fact that she arrived at her visit with Dr. Witham with a pre-prepared document that set out

historical events undermined her testimony that she was unable to concentrate or interact with

others and had a poor memory.  Doc. No. 26 at 15.

If proof of a disability is based upon subjective evidence and a credibility determination is

critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication

must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d 1553,

1562 (11th Cir. 1995).  If the Commissioner discredits the claimant's subjective testimony, "he

must articulate explicit and adequate reasons" for doing so. *Id.* at 1561-62.

Here, the ALJ cited specific evidence in the record to support his conclusion that White's

testimony regarding her limitations was not persuasive of a disabling impairment.  First, and

perhaps most importantly, he relied on the results of the MMPI-II test conducted after remand of

the case, which showed that White overendorsed her symptoms.  He noted evidence in the record

supporting the test result, including White's preparation of a document for review by Dr. Witham, her activities of daily living, her ability to drive and opinion of Dr. Perdomo and Dr. Kitay that she could perform some type of work.  This is a sufficient explanation of the credibility decision.

## V.      CONCLUSION.

It is **ORDERED** that the decision of the Commissioner is **AFFIRMED**.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on July 27, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties